**The ESTATE OF Ricky OLIVAS, By and Through its personal representative, Gloria MIRANDA, Plaintiff,**

**v.**

**The CITY AND COUNTY OF DENVER, a municipality, Former Chief of Police James Collier, in his individual and official capacities, Police Officer William Mitchell, in his individual and official capacities, and Denver Police Officer Michele Guzman, in her individual and official capacities, Defendants.**

**Civil Action No. 94–K–1884.**

United States District Court, D. Colorado.

May 22, 1996.

---

Kathleen Franco Domenico, David A. Lane, Paula D. Greisen, Denver, CO, for Plaintiff.

Theodore S. Halaby, Robert M. Liechty, Halaby Cross Liechty & Schluter, Louis B. Bruno, Bruno, Bruno & Colin, P.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiff is the Estate of Ricky Olivas, deceased, by and through his mother Gloria Miranda. Olivas committed suicide by hanging himself while in custody at Denver's District One Police Station.

Miranda asserts three claims for relief pursuant to 42 U.S.C. § 1983: (1) that a former Chief of Police and two of his officers violated her rights under the Fourth and Fourteenth Amendments to the United States Constitution when they maliciously and wantonly ignored the suicide threats of her son and failed to remove leg shackles from his holding cell[1] (First Claim for Relief); and (2) that the City and County of Denver (the "City") failed adequately to train and supervise its police officers in their handling of suicidal prisoners (Second and Third Claims for Relief).[2] On behalf of her son's estate, Miranda seeks compensatory and punitive damages in an amount to be proven at trial, together with costs and expenses, including attorney fees, pursuant to 42 U.S.C. § 1988.

Defendants move for summary judgment on all claims. I grant the motions of Chief Collier, Officer Guzman and the City, and deny the motion of Officer Mitchell.

### I. FACTS AND PROCEDURAL HISTORY

On September 1, 1992, the Denver Police Department received a domestic violence call from Ricky Olivas's girlfriend, Lynae Gallegos. Defendant Mitchell was one of the responding officers and took Gallegos's statement, attached as Exhibit E to the City's Motion for Summary Judgment. Gallegos told Mitchell Olivas was drunk, had a knife, had threatened to kill her and her kids, and had run to the bathroom to get a razor blade to cut his wrists. Police arrested Olivas. Olivas had not cut his wrists, but one of the officers told Mitchell Olivas had cuts on his fingers. Mitchell investigated, but found only "little drops of blood" in the sink. Mitchell Dep. (Defs.' Br.Supp.Mot.Summ. J., Ex. C) at 23:2–15.

Mitchell did not believe Olivas presented a serious risk of harm to himself, and did not inform the other officers on the scene, including the officer who transported Olivas to the station, of Gallegos's statements regarding Olivas's threat to commit suicide. See id. at pp. 23–27; see Gavito Affid. (Defs.' Br. Supp.Mot.Summ. J., Ex. B) (transporting officer).

Upon arrival at the substation, Olivas's belt was taken from him and he was placed in a holding cell.[3] A set of leg shackles[4] was chained to the bars of the cell. It is undisputed that the leg shackles should have been removed from Olivas's cell. See Defs.' Reply

---

1. The shackles were left chained to the bars of the cell, and Olivas hung himself with them when the officers left him unattended.

2. Miranda makes no distinction between her Second Cause of Action, where she asserts the City had a "policy, custom or habit of providing woefully inadequate training to police officers" to "recogniz[e] and deal[ ] with suicidal prisoners," from her Third Cause of Action, where she asserts the City "failed to adequately train" or "supervise" officers in their command in how to deal with suicidal prisoners. I therefore treat them together.

3. Miranda states Olivas's belt was removed as a "suicide prevention" measure. The only evidence in the record, however, was that Olivas's belt and wallet (which had chains on it), were removed pursuant to standard operating procedure because they could be used as weapons. See Miller Affid. (City's Br.Supp.Mot.Summ. J., Ex. A) at ¶ 4.

4. Leg shackles consist of two ankle cuffs joined by a length of chain approximately two feet in length.

at 2.[5] Defendant Officer Guzman was in charge of maintaining the handcuffs and leg shackles at the substation on the date in question.

Miranda filed her initial complaint in state court on or about February 28, 1994, asserting a claim for negligence against the City and three individual police officers. She amended her complaint on July 7, 1994, changing her claim to one pursuant to 42 U.S.C. § 1983 and naming the City, former Police Chief Collier and three John Does as defendants. Defendants removed the action to federal court on August 12, 1994. The case was given Civil Action No. 94–C–1884 and assigned to Judge Carrigan.

Miranda was permitted to file an amended complaint substituting Officer Mitchell for Officer John Doe A and naming only one other John Doe defendant on April 5, 1995. The City, Collier and Mitchell answered and filed the instant motions for summary judgment. Briefing on the motions was complete in June 1995. The case was transferred to me in October. Since then, Magistrate Judge Abram permitted Miranda to amend her complaint a third time to substitute the estate of Ricky Olivas for her as Plaintiff[6] and to substitute Officer Guzman for the remaining Officer John Doe. *See* Order, No. 94–K–1884 (March 25, 1996) (accepting Plaintiff's Third Amended Civil Rights Complaint for filing). Together with the other Defendants, Officer Guzman filed her answer to the third amended complaint on April 4, 1996.

## II. *MERITS*

■ To establish a claim under § 1983, a plaintiff must allege that a defendant acted under color of state law to deprive him of a right, privilege or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. Custodial officials' "deliberate indifference" to a prisoner's "serious medical needs" has been deemed by the Su-

preme Court to deprive the prisoner of his rights under the Constitution's Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). While the Eighth Amendment does not apply to pretrial detainees such as Olivas, *see Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979), the protections afforded convicted prisoners have been extended to them by operation of the Due Process Clause of the Fourteenth Amendment. *E.g., Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir.1994) (citing *Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir.1992)).

■ Under appropriate circumstances, a pretrial detainee's suicide can give rise to a § 1983 violation as an infringement of the Due Process Clause. *Hocker*, 22 F.3d at 1000; *see, e.g., Partridge v. Two Unknown Police Officers*, 751 F.2d 1448 (5th Cir.1985); *Colburn v. Upper Darby Township*, 838 F.2d 663, 668 (3d Cir.1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989), *applied in Litz v. City of Allentown*, 896 F.Supp. 1401, 1408 (E.D.Pa.1995). To establish deliberate indifference to a detainee's safety in a prisoner suicide case in this circuit, plaintiff must show

(1) 'actual knowledge of the specific risk of harm [to the detainee] ... or that the risk was so substantial or pervasive that knowledge can be inferred;' (2) 'fail[ure] to take reasonable measures to avert the harm;' and (3) that 'failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended.'

*Hocker*, 22 F.3d at 1000 (quoting *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir.1990) and citing *Bowen v. City of Manchester*, 966 F.2d 13, 17 (1st Cir.1992), *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir.1992), *Bell v. Stigers*, 937 F.2d 1340, 1343–44 (8th Cir.1991), and *Popham v. City*

---

**5.** Pursuant to jail policy, leg shackles are used when two prisoners are in a cell. They are not used when only one prisoner is in a cell. Reply at 2.

**6.** In doing so, Miranda avoided having to establish that the death of her son violated her own, as

opposed to his, constitutional rights. *Cf. Sanchez v. Marquez*, 457 F.Supp. 359, 363 (D.Colo.1978) (§ 1983 claim brought by decedent's brothers dismissed for failure to state a cognizable constitutional claim).

*of Talladega,* 908 F.2d 1561, 1563–64 (11th Cir.1990)).

Defendants' initial argument is that the "deliberate indifference" standard in *Hocker* does not apply where, as here, plaintiff seeks to impose an affirmative duty on law enforcement officials to recognize a potential suicide risk and provide care to a prisoner where he would otherwise neither have sought nor received such care himself. According to Defendants, the issues raised more closely resemble those in *DeShaney v. Winnebago County Dep't of Social Serv.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989), where the United States Supreme Court ruled there was no constitutional duty for the state affirmatively to protect a child from physical abuse by his father. Defendants argue that "because there [was] no indication that [Olivas], or anyone acting on his behalf, was seeking or would have sought treatment for his alleged condition," Defendants "deprived [him] of nothing." Defs.' Br.Supp.Mot.Summ. J. at 9, 10.[7]

I find the argument circuitous, hinging on Defendants' assertion that neither Gallegos's statements nor Olivas's behavior gave Mitchell an "indication" that Olivas was suicidal. The question of whether Mitchell had "actual knowledge" that Olivas was suicidal, or was deliberately indifferent in deciding he was not, is one of fact and a fundamental and integral element of a § 1983 claim under *Hocker.* Because a reasonable juror could infer from the evidence presented that Mitchell had such knowledge, I find it is *Hocker,* and not *DeShaney,* that provides the appropriate analogy to this case.

Alternatively, Defendants seek summary judgment under the "deliberate indifference" standard on the following grounds: (1) there was no "strong sign of suicidal tendency" in this case such that defendants could be deemed deliberately indifferent to a "known, specific risk"; (2) Officer Mitchell's conduct in dismissing Olivas' threat of suicide did not "rise to the level of subjective, criminal recklessness" required for liability for cruel and unusual punishment under *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994); (3) there are no facts demonstrating deliberate indifference on the part of the City because there was no "widespread problem" of suicide that needed to be corrected; and (4) the individual defendants have qualified immunity from suit. The first ground falls with Defendants' *DeShaney* defense; Gallegos's statements, the blood in the sink and the fact Olivas had cuts on his fingers creates a triable issue on the question of whether there was a "strong sign of suicidal tendency" in this case. I consider Defendants' remaining grounds for relief *seriatim.*

### A. *The Individual Defendants*

To support the claims of deliberate indifference against the individual Defendants, Miranda alleges Defendants did not take Olivas's threat seriously and failed to report it to other officers with whom Olivas came into contact, did not enforce their policy of removing shackles from holding cells in which only one prisoner is being detained, and did not monitor Olivas closely enough once he was in the cell. With respect to former Police Chief Collier, Plaintiff alleges that by failing adequately to train and supervise Officers Mitchell and Guzman and others, Collier ignored the "obvious risk" that suicidal prisoners could be left in situations where they could kill themselves.

#### 1. *Qualified Immunity*

 Under the doctrine of qualified immunity, "government officials performing dis-

---

7. In a dubious extension of their argument, Defendants reason as follows:

> The duty of a police officer or of a jail official to tend to the needs of a prisoner arises from the fact that because the prisoner is in custody, the prisoner cannot attend to his own needs.... However, the same reasoning does not apply in the instant case because the decedent was deprived of nothing, that is, whether he was in custody or whether he was not in custody, *he was free to make his own choice to commit suicide.*

Defs.' Br. at 9 (emphasis added). The reasoning is inapt and unnecessary. Surely, the result in *DeShaney* does not require the conclusion that the state had no duty to protect young Joshua or stop his father because each was "free to make his own choice" to be victimized by or engage in child abuse. To find support for this argument, one needs to look to the 12th century and ignore all else since then.

cretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because the doctrine is not only a defense to liability but an immunity from suit, "prior to filing an affirmative defense, a defendant can challenge a complaint by filing either a motion to dismiss or a motion for summary judgment if the plaintiff has failed to come forward with facts or allegations that establish that the defendant has violated clearly established law." *Sawyer v. County of Creek,* 908 F.2d 663, 665 (10th Cir.1990).

■ To reach the issue of qualified immunity, the Supreme Court in *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 1792–94, 114 L.Ed.2d 277 (1991), clarified that a district court must "first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all." *Applied in Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995). With respect to Officer Guzman and Chief Collier, I find Plaintiff has not.[8] Accordingly, consideration of the qualified immunity defense is limited to Plaintiff's claims against Officer Mitchell.

■ When a defendant moves for summary judgment asserting he is qualifiedly immune and his state of mind is an element of plaintiff's claim, "he must do more than merely raise the immunity defense; "he 'must make a prima facie showing of the objective reasonableness of the challenged conduct.'" *Bruning v. Pixler,* 949 F.2d 352, 356–57 (10th Cir.1991) (quoting *Lewis v. City of Ft. Collins,* 903 F.2d 752, 755 (10th Cir. 1990)). Once he has done so, the plaintiff must produce facts "'sufficient to show both that the defendant's alleged conduct violated the law and that the law was clearly established when the alleged violation occurred.'" *Bruning* at 356 (quoting *Pueblo Neighborhood Health Ctrs. Inc. v. Losavio,* 847 F.2d 642, 646 (10th Cir.1988)); *see Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992) (§ 1983 liability for high speed chase not clearly established in 1986, therefore summary judgment granted). Only after the plaintiff has met this burden must the defendant bear the usual summary judgment movant's "'burden of showing that no material issue of fact remain that would defeat his or her claim of qualified immunity.'" *Ibid.*

■ Officer Mitchell has come forward with sufficient evidence to establish a *prima facie* case that he acted reasonably in not

---

8. The only specific allegations related to Officer Guzman are that she was in charge of maintaining handcuffs and leg shackles at the station and that she failed to remove from the holding cell the shackles with which Olivas hung himself. *See* Third Am.Compl. at ¶ 15. While Plaintiff alleges generally that "in doing the acts and making the omissions alleged herein, Defendants acted maliciously and with a wanton disregard for the rights, needs and feeling [sic] of Rick Olivas," Third Am.Compl. at § 22, 29, 36, Plaintiff concedes Guzman had no knowledge of Olivas's suicide threat. Without such knowledge, Guzman could not have acted knowingly or recklessly with respect to Olivas's right to be protected from self-inflicted harm. At most, her conduct was negligent. "[T]he Due Process Clause is simply not implicated by a negligent act of an official," *see Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); liability under § 1983 requires "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

Miranda seeks to hold Chief Collier liable on the basis that by failing adequately to train and

supervise Officers Mitchell and Guzman and others, Collier ignored or was deliberately indifferent to the "obvious risk" that her son might commit suicide. It is undisputed, however, that Collier had no direct contact with Olivas and no knowledge that he had threatened suicide. Further, Miranda offers no evidence to suggest Collier either knew or should have known of a risk generally that pretrial detainees might commit suicide in his substations' holding cells. *Cf. Belcher v. City of Foley,* 30 F.3d 1390, 1397–98 (11th Cir.1994) (discussing instances where supervisory defendants could be said to be on notice, i.e., a previous suicide at the facility); *Litz,* 896 F.Supp. at 1413 (applying Third Circuit standard for imposing supervisor liability in prison suicide case). Because supervisor liability can be established only by proof of some affirmative conduct closely connected to plaintiff's injury, *see Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976), Miranda has failed to meet her burden of creating a triable question of fact to defeat Collier's qualified immunity defense.

Guzman and Collier are entitled to qualified immunity.

taking seriously the threat reported to him by Gallegos.[9] Asserting Miranda has failed to produce facts sufficient to show that his conduct violated Olivas's Fourteenth Amendment rights, Mitchell maintains he is entitled to the summary judgment.[10] I disagree.

### 2. Deliberate Indifference

■ In *Hocker*, the Tenth Circuit affirmed a decision of the district court granting defendants' motion for summary judgment in a pretrial detainee suicide case. The court rejected the argument made by the detainee's estate that because defendants knew the detainee was severely intoxicated, they were deliberately indifferent to the risk that she would commit suicide by failing to provide her with medical treatment. *See Hocker*, 22 F.3d at 1000. The Court found plaintiff's claim "without factual support" where there was no evidence to suggest defendants "had knowledge of the specific risk that [the detainee] would commit suicide" or that the detainee's "risk of suicide was so substantial or pervasive that knowledge [could] be inferred." *Id.*

In the instant case, it is undisputed that Mitchell knew Olivas had threatened suicide and that he failed to tell the other officers. While it is a close call, the question of whether Olivas's threat presented a "specific risk" that he would kill himself or that Mitchell was deliberately indifferent when he assumed the contrary is one for the jury.[11] At this stage of the proceedings, where all facts and all inferences therefrom are construed in the light most favorable to Miranda as Plaintiff, I find sufficient evidence in the record from which a reasonable juror could conclude that Mitchell had "actual knowledge of the specific risk of harm" to Olivas and that by ignoring the risk, Mitchell deprived Olivas of his right to be protected from deliberate indifference to his serious medical needs secured for him under the Fourteenth Amendment's Due Process Clause.

■ Defendants' reliance on *Farmer v. Brennan*, 511 U.S. ——, 114 S.Ct. 1970, does not alter this conclusion. In *Farmer*, the Supreme Court defined the "deliberate indifference" standard as applied to claims alleging the infliction of cruel and unusual punishment under the Eighth Amendment. At

---

**9.** At his deposition, Mitchell testified that such threats are "extremely common" in domestic dispute calls; Gallegos left her son alone in the apartment with Olivas when she went to call notwithstanding Olivas's threat to kill him too; and he investigated the threat and found only a few drops of blood in the sink, consistent with his understanding that Olivas had cut his fingers. Mitchell Dep. at pp. 20–26.

**10.** Mitchell does not address the question of whether police liability for the suicide of a pretrial detainee was "clearly established" in 1992 when Olivas hanged himself. Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. The "deliberate indifference" standard of *Estelle* (1976), and the application of the *Estelle* standard to pretrial detainees by the Tenth Circuit in *Berry* (1990) were therefore "clearly established" by 1992. The date *Estelle*'s applicability in the prison suicide context was established is less certain. The Tenth Circuit issued its decision in *Hocker* in 1994, two years after Olivas's suicide in this case. The *Berry* decision upon which *Hocker* was based was decided in 1990, and a cursory review of the caselaw indicates police liability in prison suicide cases was established in a number of circuits before 1992. *E.g., Partridge v. Two Unknown Police Officers*, 791 F.2d 1182

(5th Cir.1986); *Colburn*, 838 F.2d at 667–68 (1988); *Bell*, 937 F.2d at 1343–44 (1991); *Popham*, 908 F.2d at 1563–64 (1990). For the purposes of the instant motion, I find police officers' liability for deliberate indifference to the needs of suicidal pretrial detainees was clearly established in 1992.

**11.** *Cf. Bell*, 937 F.2d at 1344 (single offhand remark by intoxicated prisoner about shooting himself when no gun was available could not reasonably constitute a serious threat of suicide); *Colburn v. Upper Darby Township (Colburn II)*, 946 F.2d 1017, 1026 (3d Cir.1991) (where officer did not notice vertical scar on arrestee's forearm, the fact arrestee had ingested three pills and was intoxicated did not constitute serious threat of suicide); *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir.1988) (failure to recognize scars on wrist, elbows and neck as suicide hesitation cuts was at most negligence, not deliberate indifference); *Estate of Cartwright v. City of Concord*, 618 F.Supp. 722, 728 (N.D.Cal.1985), *aff'd* 856 F.2d 1437 (9th Cir.1988) (joking remark about committing suicide did not create "strong likelihood" that self-inflicted harm would occur); *Litz*, 896 F.Supp. at 1409–10 ("strong likelihood" not shown where prisoner never talked about or threatened harm to himself and had no history or marks exhibiting past attempted suicides).

———–——, 114 S.Ct. at 1978–79. To rise to the level of "punishment" for purposes of the Eighth Amendment, a prison official must not only be aware of facts from which the inference could be drawn that a substantial risk of harm exists, but he must draw that inference. *Id.* at ——, 114 S.Ct. at 1978. Even if this standard were more stringent than the one applied in this case (and I am not convinced that it is) the Supreme Court has also made clear that pretrial detainees proceeding under the Due Process Clause of the Fourteenth Amendment are often entitled to greater protection than convicted persons proceeding under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. at 535–36 & n. 16, 99 S.Ct. at 1871–72 & n. 16 ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although punishment may not be cruel and unusual under the Eighth Amendment.").

For the foregoing reasons, I conclude Mitchell is not immune from suit and allow Plaintiff's § 1983 claim against him to proceed to trial.

### B. *The City*

Miranda claims the City's custom, policy or habit of inadequately training and supervising its officers generally, and its failure to train Officer Mitchell to recognize and distinguish between real and idle threats of suicide specifically, were "causally related" to Olivas's death. These allegations are insufficient as a matter of law to impose liability on the City.

 There is no vicarious liability under § 1983. A municipality is liable under § 1983 only if actions taken pursuant to its policy, practice or custom deprive a plaintiff of his constitutional or statutory rights. *Monell v. New York City Dep't of Social Serv.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Liability for failing to train police officers exists only when the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). The standard for establishing a city's deliberate indifference in this circuit is the same as that for individual defendants, i.e., plaintiff must show (1) the city had actual knowledge of the specific risk of harm or the risk was so substantial that knowledge could be inferred; (2) the city failed to take reasonable measures to avert the harm; and (3) the failure to take such measures in light of its knowledge, actual or inferred, justifies liability for the consequences of its conduct. *Berry,* 900 F.2d at 1498.[12]

 Based on a selective reading of Officer Mitchell's deposition, Miranda asserts the "officers at the scene had no training in suicide recognition or prevention" and states Mitchell "admitted that he had seen many people make suicide threats in his years as a police officer and he knows of no way to distinguish between idle threats and serious threats."[13] According to Miranda, this lack of training, together with the fact that Olivas committed suicide, is sufficient evidence of the City's deliberate indifference to the death of her son to survive summary judgment under *Canton v. Harris.* It is not.

" '[T]o survive summary judgment, the plaintiff must go beyond her pleadings and

---

**12.** A helpful explication of this standard was set forth by the Third Circuit in *Colburn II,* 946 F.2d at 1030: To establish deliberate indifference on the part of a municipality for failure to train in the identification and treatment of suicidal detainees in the Third Circuit, a plaintiff must prove (1) that the city failed to provide specific training that could reasonably be expected to have prevented the suicide at issue, and (2) the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeeded in taking their lives.

**13.** What Mitchell actually said was that, while he received no "structured" training on determining what is a suicidal threat and what is an idle threat, *see* Mitchell Dep. at 37:19–22, he received practical training on the issue from his training officer during his 12 week "field training" period. *Id.* at 39:21–40:8. Mitchell estimated he went on about 100 domestic violence calls during field training, "over half" of which involved male suspects making the types of threats Olivas made before his arrest. *Id.* at 40:15–21.

show that she has evidence of specific facts that demonstrate that' the [City] exhibited deliberate indifference towards [her] in its alleged failure to institute a proper policy and in not properly training and supervising its officers." *Medina*, 960 F.2d at 1500 (quoting *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir.1988)). Here, there is nothing in the record to suggest the City had knowledge of a serious risk of suicide in its holding cells,[14] and certainly nothing to suggest it knew of the specific risk presented by Olivas. Miranda does not identify any specific training measures that could reasonably have been expected to have caused Olivas's custodians to recognize he was suicidal. *See Colburn II*, 946 F.2d at 1030. That specific training in the recognition and treatment of suicidal detainees would have prevented Olivas's death is a matter about which one, on this record, can only speculate. Contrary to Miranda's position in this case, the fact her son succeeded in committing suicide does not establish deliberate indifference on the part of the City. Municipal liability cannot be premised on the negligence doctrine of *res ipsa loquitur*.[15]

Further, there must be a "direct causal connection" between the municipal policies in question and the constitutional deprivation. *Berry*, 900 F.2d at 1499 (citing *Canton*). Unless a jury reasonably could conclude that the city's conduct was the " 'moving force' " in bringing about the constitutional violation at issue, summary judgment is appropriate. *See id.* (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting)). In the instant case, Miranda offers nothing but innuendo to connect Olivas's death with the City's failure to train Mitchell, and does not even suggest a connection between the City's training policies and Guzman's failure to remove the shackles from Olivas's cell.[16]

Because the evidence presented fails to provide a basis for a finding of deliberate indifference on the part of the City with respect to its customs, policies or practices regarding police training, I grant the City's Motion for Summary Judgment on Miranda's Second and Third Claims for Relief.

### III. *CONCLUSION*

Because negligence or gross negligence is insufficient to state a claim for a constitutional deprivation against a police officer, Officer Guzman is immune from suit and entitled to summary judgment. Based on the lack of evidence that former Police Chief Collier had any actual or imputed knowledge that Olivas or detainees generally presented a risk of suicide, Chief Collier is also immune from suit and entitled to summary judgment. With respect to the City, the record in this case provides no basis for a finding of deliberate indifference. The City, too, is entitled to summary judgment.

Officer Mitchell, however, is not entitled to summary judgment. A reasonable juror could find, based on Gallegos's statements to Mitchell and the fact there were drops of blood in the sink and cuts on Olivas's fingers, that Mitchell had actual knowledge that Olivas presented a serious risk of suicide, which he recklessly disregarded. Accordingly, I rule as follows:

IT IS ORDERED that Officer Mitchell's Motion for Summary Judgment and for Stay of Proceedings filed June 6, 1995 is DENIED. The Motion for Summary Judgment filed by the City and County of Denver on its own behalf and on behalf of Officer Guzman and former Chief of Police Collier on May 15 1995 is GRANTED. The Second and Third Claims for Relief in Plaintiff's Third Amended Complaint are DISMISSED. The parties are to bear their own costs.

---

**14.** There is no evidence, and Miranda does not allege, that other suicides had taken place in City jails before Olivas's death.

**15.** Translated, "the thing speaks for itself." The doctrine describes an evidentiary rule whereby the negligence of an alleged wrongdoer may be inferred from the mere fact that an accident

happened. *Black's Law Dictionary* (5th ed. West 1983).

**16.** In fact, Miranda acknowledges it was the City's policy for officers to remove shackles from the cells when not in use.