Raymond J. DRAKE, Plaintiff,

v.

CITY AND COUNTY OF DENVER, Denver Police Department, Thomas Coogan, as police chief of the Denver Police Department and in his individual capacity, James Lindsey, as a police officer of the Denver Police Department and in his individual capacity, Chester Brannan, as a police officer of the Denver Police Department and in his individual capacity, Douglas Hildebrant, as a police officer of the Denver Police Department and in his individual capacity, Dixie Grimes, as a police officer of the Denver Police Department and in her individual capacity, and Ruth Potter, as a police officer of the Denver Police Department and in her individual capacity, Defendants.

Raymond J. DRAKE, Plaintiff,

v.

COLORADO STATE BOARD OF AGRICULTURE, Colorado State University Police Department, Donn Hopkins, as police chief of the Colorado State University Police Department and in his individual capacity, Karl Swenson, as a police officer of the Colorado State University Police Department and in his individual capacity, and Gene Kirby, as a police officer of the Colorado State University Police Department and in his individual capacity, Defendants.

Nos. 90–K–2178, 91–K–382.

United States District Court,
D. Colorado.

Jan. 30, 1997.

Ann T. Sulton, Englewood, CO, for Plaintiff.

Patrick D. Tooley, Dill, Dill, Carr, Stonbraker, & Hutchings, Denver, CO, Michael L. Pierson, Assistant City Attorney, Denver, CO, Jack Wesoky, Assistant Attorney General, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

These related cases arose out of Colorado State University's decision in 1989 not to hire Plaintiff for a position with its campus police department. Plaintiff claims the decision was racially motivated and seeks damages under various constitutional and statutory theories of relief.

The cases are before me on Motions for Partial Judgment on the Pleadings and for Summary Judgment filed by the Defendants in each case.[1] I grant the motions in all respects.

## I. *INTRODUCTION.*

### A. *Facts.*

Plaintiff Raymond Drake is an African–American male. He worked as a police officer with the City and County of Denver from 1974 until he resigned in 1981. Drake alleg-

es that during the course of his service with the Denver Police Department, he conducted off-duty investigations of racism in local nightclubs. Drake characterizes these investigations as successful, but states they "failed to endear him" to his fellow officers. (*See* Second Am.Compl., ¶¶ 13–16.)

One such off-duty visit to a nightclub in July 1978 resulted in Drake drawing his gun and being arrested by the Glendale Police. The charges against Drake were dismissed, and Drake received an undisclosed amount of money from the club in a court settlement. (Second Am.Compl. ¶ 16.) No disciplinary action was taken against Drake as a result of this, or any other, incident.

In his 1981 resignation letter, Drake stated he had "not exerted much effort" in the "past few months" and had "developed a negative attitude toward my profession due to the fact that most of the laws appear to be designed for the average criminal and not in the interest of the average victim." (Defs.' Br. Support Combined Mot.J. Pleadings & Mot. Summ.J., Ex. A.) The letter stated there were "various other reasons ... which attributed [sic] to my decision to resign," but that they were "to [sic] numerous to mention." (*Id.*)

Thereafter, Drake applied for a position with the Vail Police Department. His application was denied. Drake filed a discrimination suit against Vail, and again received a settlement for an undisclosed amount of money.

On May 31, 1983, Drake submitted a request for reinstatement to the Denver Police Department pursuant to the rules and regulations of the City Civil Service Commission. These rules provide that reinstatement of former officers

> may be made only under exceptional or emergency circumstances and only if, in the opinion of the Commission, the appointing authority and the Chief of the Department, the applicant possesses special qualifications or fitness for the position and his reinstatement would materially benefit the department.

---

1. Defendants' July 1995 Motions to Dismiss certain of Plaintiff's claims are subsumed by the

Motions for Summary Judgment and are denied as moot.

(Defs.' Br. Support Combined Mot. Partial J. on Pleadings & Mot. for Summ.J., Ex. C, § 5(C).) While his request was pending, Drake accepted a position with the Larimer County Sheriff's Department. He worked as a Deputy Sheriff from July 1983 to January 1986, when he voluntarily resigned.

In a memorandum dated June 2, 1983, Robert Jevnager, Division Chief of the Police Department's Technical Service Division, stated Drake's reinstatement "would not materially benefit the department" and recommended Drake's request be denied. (Jevnager Mem., Defs.' Br., Ex. D.) The Civil Service Commission sought additional information in August 1983, and, in November 1983, Drake was advised that a background investigation would be conducted and the results forwarded to the Civil Service Commission. (*Id.*, Exs. G & H.)

City Defendant Dixie Grimes conducted the background investigation regarding Drake's reinstatement request. (*See* Grimes Mem. 3/14/84, Defs.' Br.Supp., Ex. I.) The investigation included the solicitation of written memoranda from Defendants Brannan, Lindsey and Hildebrant. The memoranda submitted by these Defendants included statements that Drake was a "supervisory problem" and had a "bad," "negative" or "[im]proper" attitude towards police work. Each opined that Drake should not be reinstated. (*Id.*)

After reviewing the investigation file, the Civil Service Commission rejected Drake's request for reinstatement. *See* Letter dated 6/6/84 (Defs.' Br. Support Mot.J. Pleadings, Ex. K). Drake sent a response to the Commission disputing the statements made by Defendants Brannan, Lindsey and Hildebrant, but in January 1985, the Commission reiterated its denial of Drake's reinstatement request. (Defs.' Br. Support Mot.J., Ex. Z.)

In March 1989, Drake applied for a patrolman position with the Colorado State University (CSU) Police Department (CSUPD) in Ft. Collins.[2] He was notified by letter that he had scored 91 on a preliminary examination, placing him third on the eligibility list for a job with CSUPD. *See* Letter from CSUPD to Drake dated 4/21/89 (Drake Affid. in Opp'n to State Defs.' Mot.Summ.J., Ex. 3, p. 7). The letter instructed him to contact Officer Kirby to schedule an interview. *Id.* at 8.

In early May, Officer Kirby conducted background checks on the six candidates from the eligibility list, including Drake. In typewritten notes, Kirby described conversations with Investigator Topenberg and Sheriff Black of the Larimer County Sheriff's Department, Sergeant Vagge of the Ft. Collins Police Department, and unidentified individuals with the Glendale and Denver Police Departments. (*Id.*, Ex. 4 at 1 (typewritten notes.))

According to Kirby, Topenberg described Drake as an "excellent 'cop' and street officer," but that he had "a propensity for civil suites [sic]" and was "paranoid reference [sic] racial problems." Vagge confirmed Drake was suing the City of Ft. Collins and the Ft. Collins Police Department and told Kirby similar suits had been filed by Drake against the Loveland and Vail Police Departments. (*Id.*)

Kirby's conversation with the Denver Police Department (DPD) representative (later identified as Officer Potter) included statements regarding the Glendale incident, Drake's resignation and unsuccessful application for reinstatement. According to Kirby's notes, Potter stated DPD had "admonished" Drake for the Glendale incident and stated "charges would have been filed by the department" had Drake not resigned. (*Id.*)

Drake was interviewed and submitted to a polygraph test and psychological examination during the first week in May 1989. On May 25, Officer Swenson of the CSUPD wrote a letter to CSU's Personnel department recom-

---

**2.** Before that, apparently in 1987, Drake applied for, and was denied, a position with the City of Ft. Collins Police Department. Drake filed suit against Ft. Collins in 1988 and, at the time he applied for a position with the CSUPD, the lawsuit was pending. Judge Carrigan dismissed Drake's constitutional and federal civil rights claims in the Ft. Collins suit, and entered summary judgment in favor of Ft. Collins on Drake's Title VII claim. In a published opinion issued in March 1991, the Tenth Circuit affirmed. *Drake v. City of Ft. Collins,* 927 F.2d 1156 (10th Cir. 1991).

mending the CSUPD position be given to nonminority candidate Dwight Burke and asking that Drake's name be taken off the eligibility list. *See* Letter from Swenson to Shirey (Drake Affid.Ex. 4, p. 2).

In the letter, Swenson expressed "concern" about the Glendale incident and the liability issues it raised. He stated Drake's interview lasted twice as long as the other candidates' interviews because, once questioned about his other lawsuits, Drake "repeatedly brought [them] up and argued that he had grounds" for filing them. (*Id.*) Swenson concluded Drake "ranked sixth out of six candidates at the end of the secondary selection process" and stated CSU's legal counsel agreed with him that Drake "fail[ed] to meet the minimum qualifications for a CSU police officer." According to the letter, CSU's legal counsel had "directed" Swenson to have Drake's name deleted from the eligibility list.

In a different letter written the same day, Drake was notified a nonminority candidate, Dwight Burke, had been selected for the CSUPD job. Drake filed a complaint with CSU's Conciliation Office the following week, stating false information had been given by his former employers in retaliation for his having filed lawsuits against them and questioning why Burke had not been asked to submit to a polygraph and psychological evaluation. He also filed an EEOC Charge of Discrimination against DPD based on Potter's statements to Kirby. *See* Charge (City's Br.Supp.Mot.Summ.J. in 90–K–2178, Ex. M). In an informal resolution of his Conciliation Office complaint, CSU agreed to keep Drake on the eligibility list.

A second CSUPD vacancy was announced on June 15, 1989, and Drake's was one of three names referred for an interview. The three candidates were interviewed by CSUPD Chief Hopkins and Officer Swenson on July 17, 1989.

On July 24, 1989, Hopkins sent a memorandum to Dana Hiatt, CSU's Equal Opportunity Office Director, describing the results of the interviews and recommending nonminority candidate Jeffrey Egnor for the job. (Drake Affid., Ex. 8.) Hopkins ranked Drake below the two other candidates interviewed, stating he was "extremely nervous" and had given a "lackluster" performance. Hopkins stated Drake's career aspirations were "not realistic" and expressed concern about Drake's "inability to get along with co-workers in two previous police jobs" and the fact he "label[ed] himself as a troublemaker."

Hiatt initially refused to approve Egnor, stating that, "given the need to increase diversity in the CSUPD," Hopkins had "not provided sufficient justification for not offering the position to [Drake]." *See* Memo. dated 2/8/89 (attached to Drake Affid., Ex. 9.) Hopkins met with Hiatt on August 7, and on August 17, submitted a detailed memorandum explaining why Drake "should not be hired just for diversity purposes as he is not the best available candidate." (*Id.*, Ex. 10, p. 3.)

In the August 17 memo, Hopkins expressed concern about Drake's demeanor, experience and career goals incompatible with taking a career position with the campus police department. Hopkins stated Drake had an "[un]realistic understanding of the job environment" and failed to answer the interviewers' questions "with the depth and understanding of the candidates ranking higher in the process." (Hopkins Memo. at 2.) Hopkins stated Drake "indicated a high sensitivity to his race in at least two levels of the interview process," which "characteristic would be extremely difficult for him to deal with when handling some of the insensitive remarks frequently made by students." *Id.* at 2. Acknowledging Drake "has the right to pursue civil remedies where he feels he was treated illegally," Hopkins said it would be "irresponsible" for him to "hire someone who has the propensity to be frequently embroiled in civil actions and the controversy stimulated by those actions." *Id.* at 3.

Hopkins also stated Drake's reference check "cause[d] a great deal of concern." (Hopkins Mem. at 3.) Hopkins stated the Glendale incident, and Drake's repeated reference during the interview to it and similar incidents, "demonstrated very poor judgement as an officer, both on and off duty." (Hopkins Memo. at 3.) Hopkins worried that Drake hadn't worked in law enforcement since 1986 and appeared to be "vacillat[ing]"

and "still dealing with [the Glendale and other] incidents." *Id.*

Citing Drake's failure to perform as well as the other candidates and the "serious concerns" the interviewers had with Drake's "qualifications, background information, problems with judgement and supervision and propensity for personal investigations that stimulate civil actions," Hopkins concluded Drake "[was] not the best available candidate." (Hopkins Memo. at 3.)

Hopkins' memo apparently allayed Hiatt's concerns and Egnor was offered the position. CSU notified Drake of its decision on September 27, 1989. *See* Letter dated 9/27/89 (attached to Drake Affid. at Ex. 14, p. 2).

Drake immediately lodged a formal complaint with CSU's Equal Opportunity Council. A hearing was conducted on December 18 and 19, 1989 and the Hearing Panel issued its findings in early January 1990. *See* Findings (attached to Drake Affid., Ex. 15 at p. 3). The Panel found no "direct evidence" to support Drake's claims of discrimination, but found CSUPD's hiring process "inconsistent" and "sloppy." *Id.* The Panel made several recommendations, including that the policy of waiving polygraph and psychological evaluations for candidates already employed by CSU be changed. *Id.*

Although he makes no mention of it in his affidavit, Drake apparently applied for a third time with CSUPD in May 1990. The documents submitted in support of his affidavit include a June 14, 1990 letter notifying Drake he had placed among the top 10 candidates in his qualifying written exam and would move on to further written, polygraph and psychological examinations. (Drake Affid., Ex. 18.) Also included, however, is a memorandum from Carol Shirey to Drake dated August 23, 1990 (Ex. 19), informing him CSU had found a "discrepancy" in the release portion of the "Security Investigation Data for Sensitive Position" form he had signed and submitted as part of the hiring process. "To continue in the competition," the memo stated, Drake was asked to sign, date and return a copy of the original release portion of the form, which was enclosed. *Id.*

Drake signed the document, but inserted the words "to not" in front of the word "release" thereby changing its meaning. By way of explanation on the back of the document, Drake stated it had "come to [his] attention that past employers had provided FALSE and negative information about [him]" and further stated he would "not release anyone from liability." (*Id.*, Ex. 19.)

In a letter dated August 31, 1990, Drake was notified he had been "disqualified from further consideration" for a position with CSUPD based on his failure to comply with the release portion of the "Security Investigation" document. *See* Letter from Shirey to Drake (Drake Affid., Ex. 19. p. 4). Drake filed an EEOC charge against CSUPD on September 26, 1990 (Ex. 20) claiming the disqualification was racially motivated and filed Civil Action No. 90–K–2178 against the City. After receiving an "Opinion of No Probable Cause" from the EEOC in February 1991 related to his charge against CSUPD, Drake filed Civil Action No. 91–K–382. Both cases were assigned to now Chief Judge Matsch.

Drake proceeded *pro se* until counsel was appointed for him in April 1994. Amended Complaints were filed in both actions in May 1994. Second Amended Complaints were filed in May 1995. The amended complaints named fewer defendants, but not fewer claims. The cases were transferred to me in July 1996.

### B. *Drake's Claims.*

Drake's Second Amended Complaint in 90–K–2178 asserts six causes of action against the City and County of Denver, the Denver Police Department, the Chief of Police, and five police officers (collectively, the "City Defendants"). Drake claims that by refusing to reinstate him as a police officer in 1984 and by preventing him from being hired by CSUPD and other law enforcement agencies between 1984 and 1989, the City Defendants (1) violated his rights under the Fourteenth Amendment to the United States Constitution; (2) impeded his ability to work for the City or State in violation of his rights under 42 U.S.C. §§ 1981 and 1983; (3) engaged in an "ongoing conspiracy" in violation of 42 U.S.C. §§ 1983, 1985 and 1986; (4) and vio-

lated Title VII and the Civil Rights Act of 1991. In addition, Drake asserts the individual City Defendants are liable to him for defamation related to the City's 1984 refusal to reinstate him (Claim 5) and that Officer Potter, the City and County of Denver and the Denver Police Department are liable for "invasion of privacy" related to Potter's statements to Kirby in 1989 (Claim 6).

Drake's Second Amended Complaint in 91–K–382 asserts four claims for relief against CSU, the Colorado State Board of Agriculture (SBA), CSUPD, Police Chief Hopkins, and Officers Swenson and Kirby (the "State Defendants"). Drake claims CSUPD's refusal to hire him violated his rights under the First (Claim 1) and Fourteenth (Claim 2) Amendments to the United States Constitution; were the product of a conspiracy between the City and State Defendants to prevent him from having a fair or equal chance to compete for a CSUPD police officer position in violation of 42 U.S.C. §§ 1983, 1985 and 1986 (Claim 3); and constituted discrimination based on race in violation of Title VII and 42 U.S.C. §§ 1981 and 1983 (Claim 4).

 There are numerous and fatal flaws in each of Drake's claims. For example, the Civil Rights Act of 1991 merely augments the remedies available to individuals under existing civil rights statutes; it does not create an independent cause of action. Similarly, there is no cause of action for damages directly under the United States Constitution for the deprivations alleged.

 Drake's constitutional and §§ 1981, 1983, 1985, and 1986 claims against the State

of Colorado (whether identified as the SBA,[3] CSUPD or CSUPD Officers Hopkins, Kirby and Swenson in their "official capacities")[4] are barred by the Eleventh Amendment. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (neither state nor its officials acting in their official capacities are "persons" for purposes of federal civil rights statutes). Drake's attempt to avoid the Eleventh Amendment bar by seeking a declaratory judgment that Defendants violated his constitutional rights is unavailing. *See Saum v. Widnall,* 912 F.Supp. 1384, 1394 (D.Colo. 1996) (purpose of declaratory remedy is to minimize danger of avoidable loss and unnecessary accrual of damages, not to answer "hypothetical question of constitutional law" where doctrines of governmental immunity bar recovery of monetary damages (citations omitted)).

 While not barred by the Eleventh Amendment, Drake's constitutional and §§ 1983, 1985 and 1986 claims against the City and City police officers in their "official capacities,"[5] also fail as a matter of law because they are premised on the same allegations as form the basis of Drake's Title VII claim. *See Drake v. City of Ft. Collins,* 927 F.2d 1156, 1162–63 (10th Cir.1991) (affirming dismissal of conspiracy and § 1983 claims asserted by Drake against the City of Ft. Collins because they were premised on no rights other than those created by Title VII).

 Even if these claims are premised on independent constitutional grounds,[6] they are legally deficient. Drake's failure to ad-

---

**3.** The SBA, as the entity that controls CSU, is the proper defendant to any suit against the university. *Roberts v. State Board of Agriculture,* 998 F.2d 824, 826 & n. 1 (10th Cir.1993). The naming of CSU as a separate defendant in a suit against SBA is improper and redundant. *Id.*

**4.** Suit against state employees in their "official capacities" is no different from one against state itself. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989).

**5.** Again, a suit against a municipal employee in his "official capacity" is the same as a suit against the City. The naming of both is redundant. *See Doe v. Douglas County Sch. Dist. RE–1,* 775 F.Supp. 1414, 1415 (D.Colo.1991).

**6.** At paragraphs 46–48 of his Second Amended Complaint, Drake asserts Officers Spickard, Lindsey, Brannan, Hildebrant, and Potter violated his equal protection and due process rights under the Fourteenth Amendment when they "recklessly" and with "deliberate indifference" provided false and defamatory information to CSUPD "under color of state law." Drake asserts the City is liable for these Defendants' actions under § 1983 because its "failure to train, supervise, discipline, regulate or otherwise control the defendant police officers" constituted "an official policy, practice or custom of condoning" such conduct and was the "proximate cause" of his injuries. (*Id.* ¶¶ 47–48.)

dress the issue of qualified immunity and to offer any evidence to support his allegations that the individual Defendants' conduct violated his constitutional rights are fatal to his claims against Chief Coogan and Officers Lindsey, Brannan, Hildebrant, Grimes, and Potter. *See Estate of Ricky Olivas v. City & County of Denver*, 929 F.Supp. 1329, 1334–35 & n. 8 (D.Colo.1996) (conclusory allegations of constitutional violations by police officers and inadequate supervision by police chief insufficient to survive summary judgment based on qualified immunity defense). Further, Drake's claims against Coogan, Lindsey, Brannan, Hildebrant, and Grimes are time-barred in that they are premised on claims related solely to Drake's ill-fated effort in 1984 to be reinstated with the DPD. The five years between these Defendants' conduct and the filing of these lawsuits is fatal to Drake's claims.

Drake's claims against the City fail because Drake has inadequately alleged, and has presented no evidence to support, his "failure to train or supervise" theory of constitutional deprivation. *See Olivas* at 1340–41 (liability under this theory exists only when the City's failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact") (citing *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989)). Drake's allegations relate solely to the individual acts of Chief Coogan with respect to Drake's application for reinstatement. They do not state a claim for municipal liability.

Not surprisingly, Drake appears to have narrowed his claims to (1) claims for employment discrimination and retaliation against the City Defendants under § 1981 and Title VII and against the State Defendants under Title VII; and (2) a common law tort claim for defamation against the individual City Defendants other than Officer Potter related to his unsuccessful 1984 application for rein-statement, and defamation claim against Officer Potter related to her 1989 statements to Kirby. *See* Joint Status Rep. (filed 7/26/96) at 2 (Summary of Claims and Defenses).[7] I address these claims below.

## II. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–2510, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, I must construe the facts and draw inferences from them in the light most favorable to the nonmoving party. *Id.* If a reasonable trier of fact could not return a verdict for the nonmoving party, summary judgment is proper. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The purpose of summary judgment is to determine whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). To avoid summary judgment in this case, Drake therefore must refer to specific facts beyond those in the pleadings and demonstrate the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. He will not survive summary judgment if the evidence he presents is "merely colorable or is not significantly probative." *Vitkus v. Beatrice Co.*, 11 F.3d 1535 (10th Cir.1993). Unsupported allegations without "any significant probative evidence tending to support [them]" are insufficient, *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, as are conclusory assertions that factual disputes exist. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d 202 (1986).

7. *See also* Pl.'s Resp.Defs.' Reply Filed 3/8/96 (No. 90–K–2178) at 1 (plaintiff's original and amended complaints "essentially allege[ ]" defendants "have conspired to prevent him from being employed as a police officer … in retaliation for [his] opposition to racial discrimination in public accommodations in the late 1970s and because he filed a complaint of employment discrimina-tion against the Vail Police Department in or around 1983"); Pl.'s Resp.Defs.' Reply Filed 1/17/96 (No. 91–K–382) at 1 (plaintiff's original and amended complaints "essentially allege[ ]" he was denied employment by CSUPD "because of his race or color or in retaliation for having filed complaints of employment discrimination against police departments").

### III. *DISCUSSION.*

#### A. *Employment Discrimination Claims.*

Drake asserts the decisions by CSUPD not to hire him and the actions of DPD Police Officer Potter in providing CSUPD with negative information regarding his tenure with the Denver Police Department violated his right to be free of employment discrimination under Title VII and 42 U.S.C. § 1981.[8]

##### 1. *The Title VII claim against the City and DPD.*

■ Drake's Title VII claim against the City and DPD stem from the "negative statements" made by Officer Potter to Kirby in the course of CSUPD's May 1989 reference check. According to Drake, Potter's statements were made for the purpose of "preventing" him from being hired by CSU and were made in retaliation for his actions while employed by DPD to oppose racial discrimination.

It is difficult to discern Drake's theory of liability under Title VII with respect to the City or DPD. Neither the City nor DPD was Drake's "employer" in 1989, and neither is alleged to have made an adverse employment decision related to him at that time. Further, Drake does not allege or explain how Potter's conduct could be attributed to the City or DPD for purposes of Title VII.

Drake has failed to allege facts sufficient to state a claim for relief under Title VII or § 1981 and those claims are therefore dismissed.

##### 2. *Drake's claims against CSUPD.*

Drake's employment discrimination claims against CSUPD stem from CSU's failure to hire him in 1989 and 1990 and Chief Hopkins' reasons for recommending so in his August 17, 1989 memo.

Leaving aside issues of the adequacy and timeliness of Drake's EEOC charges raised by the State Defendants, I consider these claims on their merits.

■ The analysis of employment discrimination claims is the same whether brought under § 1981 or Title VII: Absent direct evidence of discriminatory motive, I must apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Randle v. City of Aurora*, 69 F.3d 441, 450–51 (10th Cir.1995).

■ Under the *McDonnell Douglas* analysis, plaintiff must first establish a *prima facie* case of discrimination. If he succeeds, the burden of production then shifts to the employer to offer a facially nondiscriminatory reason for its employment decision. If the employer does so, the presumption of discrimination created by the *prima facie* showing dissolves and plaintiff assumes his normal burden of proving that discriminatory animus more likely than not motivated the employer's decision. *Randle*, 69 F.3d at 453.

■ At the summary judgment stage, it is plaintiff's burden to present evidence sufficient to create an inference that discriminatory animus more likely than not motivated the employer's decision. *Randle*, 69 F.3d at 451–53; *Cone v. Longmont Hosp.*, 14 F.3d 526, 530 (10th Cir.1994). Plaintiff can meet this burden by presenting direct evidence of discrimination, or, if he is relying on circumstantial evidence, by establishing his *prima facie* case and then coming forward with evidence showing defendant's proffered reason for the challenged action is pretextual— i.e., unworthy of belief. *Randle* at 451.

In the instant case, Drake purports to rely on both direct and circumstantial evidence to meet his burden on summary judgment. Drake's "direct evidence" of discriminatory animus is Hopkins' statement in the August 1989 memo that Drake exhibited a "high sensitivity to his race" that would make it "difficult for him to deal with when handling some of the insensitive remarks frequently made by students" (Hopkins Mem. at 2) and that it would be "irresponsible" for Hopkins to "hire someone who has the propensity to be frequently embroiled in civil actions and

---

8. Drake also asserts Title VII retaliation claims against former DPD Police Chief Coogan and Officers Lindsey, Brannan, Hildebrant, and Grimes arising out of the City's 1984 refusal to reinstate him. These claims fail for a number of reasons, including the fact that Drake never filed an EEOC charge related to them.

the controversy stimulated by those actions." (*Id.* at 3.) Drake's circumstantial evidence is simply that Hopkins' nondiscriminatory reasons for refusing to hire him are "unbelievable." Neither is sufficient to withstand summary judgment.

 Hopkins' statements regarding Drake's sensitivity to race do not constitute "direct evidence" of discriminatory intent. Direct evidence is any evidence that proves a fact in question without reliance upon inference or presumption. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989). In the employment context, such evidence must speak directly to the alleged discriminatory intent. *Id.* Standing alone, Hopkins' statements do not constitute evidence of discriminatory intent. Hopkins simply did not say that Drake should not be hired because he was African–American.

 Drake's efforts to create an inference of discriminatory intent indirectly by challenging CSU's proffered reasons fail because Drake has come forward with no appropriate evidence to support the inference. For example, Drake contends the Glendale incident could not have been a basis for CSU's decision because Hopkins purportedly interviewed Drake for a job in another jurisdiction in 1980 and "knew or should have known of the 1978 Glendale incident" at the time. Drake offers no citation to the record to support his contention, and my review found no mention of a 1980 interview.

As further "evidence" that Hopkins' concern over the Glendale incident was pretextual, Drake points to the "positive" statements Larimer County Sheriff Black made to Kirby during the May 1989 background check. *See* Typewritten Notes (Drake Affid. in Opp'n to State Defs.' Mot.Summ.J., Ex. 4). Not only do I fail to see how Black's statement that Drake "would make a good officer" casts doubt on the credibility of Hopkins' concerns, Black's additional statement that he did not rehire Drake because Drake "did not plan to stay also" supports one of Hopkins' other reasons for recommending against Drake, namely, Drake's history of "vacillating" about wanting to be a police officer since he resigned from the Sheriff's Department in 1986.

Drake's other attempts to discredit Hopkins' nondiscriminatory reasons amount to little more than subjective and unsupported differences of opinion. For example, Drake denies the various incidents cited by Hopkins actually "show[ed] poor judgment," [9] and, with respect to Hopkins' concerns that his training was inadequate, Drake simply states that "[n]owhere is there any evidence that plaintiff was not trained as a law enforcement officer." *See* Pl.'s Resp. to Reply Filed 1/17/96 at 10–11.

Drake misapprehends his burden with respect to his claims and Defendants' Motion for Summary Judgment. It is he who must come forward with evidence of pretext, which he has failed to do.[10]

On this record, Drake's claim that he was discriminated against based on his race and color is entirely without merit. The only item that gives me pause is Hopkins' statement that Drake's "sensitivity to his race" and "propensity to be frequently embroiled in civil actions" were factors in his decision to recommend another applicant for the July 1990 vacancy. Such statements raise the following question: Will a plaintiff survive summary judgment on a Title VII retaliation claim simply by establishing that his history of filing discrimination charges was a factor in defendant's decision not to hire him?

**9.** According to Drake, his conduct during the Glendale incident, as well as in another incident in which he purportedly threatened to arrest a fellow officer, was appropriate because as an officer, he was "required to enforce all laws." *Id.*

**10.** I note the reason offered by CSUPD for disqualifying Drake from further consideration for a position with the department—i.e., his submission in June 1990 of an altered release form followed by his refusal in August to sign an unaltered one—receives little attention from Drake even though it formed the basis for the EEOC charge Drake argues satisfied the jurisdictional prerequisite for the filing of 91–K–382. Drake *never denies the original form was altered* or that he refused to authorize the release of information from his former employers. He only argues his refusal was justified because he knew such information would be negative.

▉ I conclude that where, as here, plaintiff has failed to discredit any of the employer's facially nondiscriminatory reasons for not hiring him, and the only evidence in the record shows defendant considered plaintiff's "propensity" for filing lawsuits only as it related to his ability to do the job for which he was applying, plaintiff will not survive summary judgment. Accordingly, Drake's employment discrimination claims fail as a matter of law and Defendants' Motion for Summary Judgment in 91–K–382 is GRANTED in all respects.

### B. *Defamation Claims.*

The dismissal of Drake's federal claims in 90–K–2178 compels the dismissal of his state claims for defamation against the individual City Defendants. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). While this dismissal would be without prejudice under *Gibbs,* I agree with Defendants that any refiling of Drake's defamation claims in state court would be futile because they fail as a matter of law.

▉ In *Zerr v. Johnson,* 894 F.Supp. 372, 376 (D.Colo.1995), I held that, in order to satisfy the "willful and wanton" exception to the Colorado Governmental Immunity Act (CGIA) shielding governmental officials from suits in tort, Colo.Rev.Stat. §§ 24–10–101 *et seq.,* a plaintiff must establish not only the elements of a claim for defamation (i.e., that the defendant knowingly or recklessly published a false statement about him), but also that the defendant's conduct was done heedlessly and recklessly, without regard to the consequences, or rights and safety of others, particularly plaintiff. 894 F.Supp. at 376. Where, as here, plaintiff's allegations regarding the willfulness and wantonness of a governmental official's conduct are the same as form the basis of the underlying tort itself, plaintiff will not avoid application of the CGIA. *Id.*

Accordingly, Drake's remaining claims in 90–K–2178 fail as a matter of law.

### IV. *CONCLUSION.*

Based on the foregoing, IT IS ORDERED that Defendants' Combined Motion for Judgment on the Pleadings and for Summary Judgment in No. 90–K–2178 and Defendants' Motion for Summary Judgment in 91–K–382 are GRANTED. Judgment shall enter against Plaintiff and in favor of Defendants in both actions.

Defendants may file motions for attorney fees and costs pursuant to 28 U.S.C. § 1927, 42 U.S.C. § 1988 and/or Rule 11, Fed. R.Civ.P. if filed on or before February 20, 1997. If filed, Plaintiff shall have until March 3, 1997 to respond and Defendants until March 13, 1997 to reply.